## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| S.N. and G.N., Individually and as Guardians ad litem of I.N., | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 11-3876 |
| v. | : | |
| WASHINGTON TOWNSHIP BOARD OF EDUCATION, | : | **MEMORANDUM OPINION & ORDER** |
| Defendant. | : | |

This matter has come before the Court on cross-motions for summary judgment on the record below in an Individuals with Disabilities Education Act (IDEA) case. Oral argument was heard on the motions on May 15, 2012, and the record of that proceeding is incorporated here. For the reasons expressed on the record that day, as well as those articulated below, summary judgment will be entered in Defendant's favor.

### PROCEDURAL HISTORY

The Complaint in this matter was filed on July 6, 2011 pursuant to the IDEA, 20 U.S.C. § 1415(i)(2)(A), by the parents of an educationally disabled student residing in Washington Township, New Jersey. The parents filed a petition for due process on or about June 29, 2010 because they disagreed with their child's Individualized Education Program (IEP) for the 2010-11 school year. In short, the parents felt that the school district's in-district placement was inappropriate and not reasonably calculated to confer educational benefit upon their child. They have maintained that the most appropriate placement for I.N. was at St. Lucy's School for the Blind in Philadelphia, Pennsylvania.

After six days of hearing, a decision was rendered by an administrative law judge on April 12, 2011. In a fifty-seven page decision, the ALJ ruled in favor of the Defendant,

finding that the most appropriate educational placement in the least restrictive environment for I.N. was in district.  On July 6, 2011, Plaintiffs filed the Complaint requesting that this Court grant reimbursement of all expenses incurred in sending I.N. to St. Lucy's, as well as counsel fees and costs.  Cross-motions for summary judgment were filed on December 12, 2011.

## STANDARD OF REVIEW

"When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified *de novo'* review."  D.S. v. Bayonne Bd. Of Educ., 602 F.3d 553, 564 (3d Cir. 2010).  See also Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (noting that the district court "must make its own findings by a preponderance of the evidence" but "also afford 'due weight' to the ALJ's determination").  Where, as here, a district court reviews administrative fact finding without hearing additional evidence, it is "required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence in the record."  S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003).

## IDEA

Congress enacted the IDEA as a means to ensure that states follow a mandate to provide a "free and appropriate education" ("FAPE") to all disabled children.  20 U.S.C. § 1412(a)(1)(A).  FAPE is defined as "special education and related services that (A) have been provided at public expense . . . without charge; (B) meet the standards of the State educational agency; (C) include an appropriate . . . education in the State involved; and (D) are provided in conformity with the [IEP]."  20 U.S.C. § 1401(8).  That is,

"[e]ducational instruction specially designed to meet the unique needs of the handicapped child," coupled with services "necessary to permit the child to 'benefit' from the instruction" constitute a FAPE. Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d Cir. 1995) (quoting Board of Educ. v. Rowley, 458 U.S. 176, 188-89 (1982)). Thus, "[a] school district provides a FAPE by designing and implementing [an IEP] reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 729-30 (3d Cir. 2009). New Jersey has enacted regulations which are intended to fulfill its responsibilities under the IDEA. N.J. Admin. Code 6A:14-1.1(b).

A parent who believes that a school district has not provided his or her child with a FAPE as required under IDEA, may request a due process hearing or a mediation conference. See Lascari v. Bd. of Educ., 560 A.2d 1180, 1184 (N.J. 1989). New Jersey has designated its Office of Administrative Law ("OAL") to hear the special education complaints filed with the Department. L.P. v. Edison Bd. of Educ., 265 N.J. Super. 266, 274 (N.J. Super Ct. Law Div. 1993). The dispute is adjudicated by an ALJ, who has authority under the IDEA and New Jersey law to deem the IEP inappropriate. See id.; N.J. Admin. Code 6A:14-2.7. Parents challenging the IEP may be entitled to reimbursement of their education costs if the ALJ finds that the IEP was inappropriate, and that the parents' unilateral placement was appropriate, Florence Cty. Sch. Dist. v. Carter, 510 U.S. 7, 12 (1993), if the parents complied with the notice and reevaluation requirements of the IDEA and New Jersey regulations, 20 U.S.C. § 1412(a)(10) and N.J. Admin. Code 6A:14-2.10(c), and if the parents cooperated with the school district, Patricia P. v. Board of Educ. of Oak Park, 203 F.3d 462, 468 (7th Cir. 2000). Thus, the

3

first step in determining whether a parent is entitled to reimbursement under a unilateral placement theory is whether the school district provided the child with FAPE. N.J. Admin. Code § 6A:14-2.10(a); <u>Shore Regional</u>, 381 F.3d at 198-99 (3d Cir. 2004).  If the school did provide FAPE, the parent is not entitled to reimbursement.   The second and third steps of the unilateral placement analysis look at whether the unilateral placement was appropriate and whether parents complied with the notice and reevaluation requirements of the IDEA and New Jersey regulations so as to warrant reimbursement.  <u>Shore Regional</u>, 381 F.3d at 198-99.

Pursuant to 20 U.S.C. § 1415(i)(2), aggrieved parties may appeal the ALJ's decision to a state or federal district court.  <u>See also</u> <u>C.H. v. Cape Henlopen Sch. Dist.</u>, 606 F.3d 59, 66 (3d Cir. 2010).  "[T]he Supreme Court has directed that a school district's liability for violations of the IDEA is a two-fold inquiry: (1) Has the school district complied with the procedures set forth in IDEA?; and (2) Has the school district fulfilled its obligation to provide the student with a FAPE?"  <u>Id.</u> at 66.

Also pursuant to the IDEA, a procedural violation committed during the formulation of a child's IEP is actionable only if that violation: (1) impedes the child's right to a free appropriate public education; (2) significantly impedes the parents' opportunity to participate in the decisionmaking process; or (3) causes a deprivation of benefits.  <u>Winkelman ex rel. Winkelman v. Parma City Sch. Dist.</u>, 550 U.S. 516 (2007) (citing 20 U.S.C. § 1415(f)(3)(E)(i) & (ii)); <u>see also</u> <u>C.H. v. Cape Henlopen Sch. Dist.</u>, 606 F.3d at 67 (3d Cir. 2010) (a procedural violation constitutes a denial of a FAPE when that violation causes "'substantive harm'" to the child or her parents and "'significantly impede[s] the parent's opportunity to participate in the decision-making process

4

regarding the provision of a FAPE to the parent's child.'" (quoting 34 C.F.R. §
300.513(a)(2)); W.G. v. Board of Trustees, 960 F.2d 1479, 1484 (9th Cir. 1992) (holding
that only "procedural inadequacies that result in the loss of educational opportunity or
seriously infringe the parents' opportunity to participate in the IEP formulation process
clearly result in the denial of a [free and appropriate public education]") (citations
omitted); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir. 1990) (en banc)
("Before an IEP is set aside, there must be some rational basis to believe that procedural
inadequacies compromised the pupil's right to an appropriate education, seriously
hampered the parents' opportunity to participate in the formulation process, or caused a
deprivation of education benefits.") (citations omitted).

## SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if there is no genuine issue of material fact and if,
viewing the facts in the light most favorable to the non-moving party, the moving party
is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d
471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986));
accord Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a
movant who shows that it is entitled to judgment as a matter of law, and supports the
showing that there is no genuine dispute as to any material fact by "citing to particular
parts of materials in the record, including depositions, documents, electronically stored
information, affidavits or declarations, stipulations . . . admissions, interrogatory
answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could
return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477

5

U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

## ANALYSIS

The facts essential to the Court's decision in this matter are not in dispute.  I.N. lives with her parents, Plaintiffs S.N. and G.N. within the Washington Township School District ("District") which is operated by the Defendant, Washington Township Board of Education.  I.N. is visually impaired and eligible for special education services.  As a pre-school student, in 2007, I.N. was evaluated for speech, physical therapy, and occupational therapy.  Pursuant to a May 24, 2007 IEP, I.N. attended school out-of-District at the Overbrook School for the Blind in Philadelphia, Pennsylvania for the 2007-08 school year.  She was re-evaluated in March 2008 and January 2009, and continued at Overbrook for the 2008-2009 and 2009-2010 school years.

I.N. was to advance from kindergarten to first grade in September of 2010. Because she is of above average intelligence, it was determined that Overbrook would no longer be an appropriate placement for I.N. because, unlike her peers at Overbrook, I.N. does not have cognitive impairments, and was in need of a less restrictive educational environment.  Therefore, Defendant's Assistant Superintendent of Student and Special Services, Michael Rolen, undertook an investigation of I.N.'s needs and placement options, which included: 1) reviewing I.N.'s most recent IEP and familiarizing himself with I.N.'s diagnosis; 2) researching best practices in the education of visually impaired ("VI") students and contacting other New Jersey school districts for in-district programs; 3) contacting local colleges and universities with programs for Teachers of the Visually Impaired ("TVI") to inquire about the possibility of the District hiring a TVI; and 4) contacting the New Jersey Commission for the Blind ("Commission") to discuss educational services available to VI students.  See Decision, p. 12, 34-35.

7

Rolen found that the parochial school placement requested by Plaintiffs, St. Lucy's, weaves religious instruction into all aspects of the instructional program. Decision, p. 5.  Rolen also determined that St. Lucy's was too restrictive in that it was far removed from I.N.'s home and not accountable to New Jersey state standards of student competency.  Id.  I.N.'s 2010-11 IEP indicates that "[c]onsideration was given to placement at St. Lucy's.  Such placement was not permitted, according to state regulations."

I.N.'s child study team assembled for IEP meetings on June 1 and 10, 2010. Plaintiffs and Plaintiffs' attorney were present at both meetings.  Because I.N. had never attended an in-District program, the Present Levels of Educational Performance, Goals and Teaching Strategies were initially drafted by I.N.'s teacher for the 2008-2009 and 2009-2010 school years at Overbrook, Anita Brophy.  At the June 1 meeting, Plaintiffs requested more specificity within the IEP; therefore, the Present Levels of Educational Performance, Goals and Teaching Strategies were revised and a second IEP meeting of the child study team took place on June 10.  During the June, 2010 IEP Team meetings, there were no concerns expressed about insufficient information regarding Defendant's knowledge of I.N.'s educational needs as reflected in I.N.'s Present Levels of Educational Performance.  No additional evaluations or assessments of I.N. were requested.  Earlier, at a February 20, 2009, Evaluation Planning Conference meeting, the IEP Team, which included Plaintiffs, agreed that no additional evaluations or assessments of I.N. were necessary because I.N. does not have a learning disability; Plaintiffs signed a Consent Statement at that time agreeing that no further assessments were warranted.  See Decision, p. 34.

8

I.N.'s 2010-2011 IEP, which was developed over the course of the two June 2010 IEP Team meetings, contained a comprehensive program of special education and related services for I.N. to attend Birches Elementary School, which included: 1) in-District in-class Resource Program staffed by a general education teacher and a District TVI assigned specifically to I.N.; 2) direct Braille instruction provided by the District's TVI five days per week; 3) direct Braille instruction provided by a Commission TVI; 4) O & M training provided by the Commission; 5) one-to-one paraprofessional aide; 6) one-to-one bus aide; 7) sixty minutes of occupational therapy per week; 8) sixty minutes of physical therapy per week; and 9) adapted Physical Education as necessary. See Decision, p. 35-36. Further, the 2010-2011 IEP contained seven measurable goals specifically directed toward addressing I.N.'s needs, which was confirmed by Brophy. See Decision, p. 36-38. Each goal was accompanied by approximately fifty-two teaching strategies, which included specialized materials and equipment solely for use with VI students. See 2010-2011 IEP. Although comprehensive, "[t]he IEP was a framework, not a lesson plan, and was meant to be continually evolving." Decision, p. 35.

Rolen hired I.N.'s TVI, Elyse Giordano, at the end of July, 2010, after interviewing two other potential TVI candidates; the three interviews were specifically guided by a list of Plaintiffs' concerns regarding the education of I.N. in an in-District program. The District also entered into a formal agreement with the Commission through a Level Three Services Contract, and submitted purchase orders for the specialized materials and equipment listed in the 2010-2011 IEP. See Decision, p. 35; Comegno Cert., Ex. 8, 9. In addition, Annette Miller, the Building Principal: 1) reviewed I.N.'s file; 2) evaluated the accessibility of Birches with the custodian; 3) selected Diane

9

Zambino as I.N.'s regular education teacher, based on Zambino's experience with special education students; 4) selected a one-to-one paraprofessional aide familiar with Zambino; 5) oversaw the Brailling of Birches; and 6) made special arrangements for a certified special education teacher to act as a substitute upon Giordano's absence.  See Decision, p. 13, 43.

Giordano was paid for additional hours to come in prior to the start of the school year to prepare for I.N.'s arrival and, under the supervision of Miller, Brailled I.N.'s classroom, Brailled areas of the building I.N. would access, conducted an in-service for Birches faculty regarding I.N.'s needs, trained I.N.'s one-to-one paraprofessional aide, Brailled storybooks for the classroom and library, and wrote detailed lesson plans for the first two weeks of school.  See Decision, p. 22-23, 25, 42-43; Comegno Cert., Ex. 10. The Commission assigned a TVI, Kimberly Mastroianni, to I.N., and Mastroianni met with Giordano to discuss the class schedule and coordinate I.N.'s Braille instruction, met with Giordano, Miller, and Zambino to discuss adapting the first grade regular education curriculum and assessments.  See Decision, p. 20-21.

S.N. cancelled an initial meeting with the Commission to sign necessary consent forms to formally "open the case," and subsequently, failed to cooperate in scheduling another meeting; as a result, the Commission was unable to review I.N.'s records, request and/or conduct assessments, obtain input from or address Plaintiffs' questions or concerns, and provide necessary materials and equipment to assist with implementation of the 2010-2011 IEP prior to the start of the 2010-2011 school year. See Decision, p. 19, 41.

S.N. visited I.N.'s classroom at Birches on September 3, 2010.  Defendant did not learn that I.N. would not be attending Birches for the 2010-2011 school year until I.N. failed to attend the first day of school on September 7, 2010.

Plaintiffs, through their attorney, objected to the implementation of the June 10, 2010 IEP.  Hearings in the Office of Administrative Law were held on September 8, 2010, September 23, 2010, October 28, 2010, November 8, 2010, February 1, 2011, and March 14, 2011. The underlying decision by the ALJ was rendered on April 12, 2011. The request for reimbursement of tuition and travel expenses was denied.

Plaintiffs have argued that the June 2010 IEP failed to set forth with sufficient particularity necessary aspects of the expanded core curriculum.  Specifically, Plaintiffs cite to "no statement of functional performance in violation of 34 C.F.R. § 300.320(a)(1)" and "no statement of annual goals for functional performance in violation of 34 C.F.R. § 300.320(a)(2)."  (Pl. Reply Br., p. 9, 10.)[1]  Defendant argues that each area of the ECC was appropriately addressed by a goal, teaching strategy, and/or related service specifically set forth in the 2010-11 IEP.

The ALJ addressed this objection on page 52 of his decision:

> While the IEP could have contained additional detail, and been more specific, this deficiency does not rise to the level necessary to declare the IEP insufficient.  As drafted by Brophy [I.N.'s special education teacher at Overbrook], all seven goals in the IEP were appropriate and measurable.  Each goal consisted of at least fifty-two teaching strategies, designed to accomplish each goal.  Each goal also obtained a comprehensive list of specialized materials and equipment that were to be used on I.N.'s behalf.  As to the specificity of the ECC, -four out of the nine ECC areas were addressed directly in the goals and outcomes sections of the IEP.  The ECC areas not directly addressed in the goals and outcomes sections of the IEP were social-interaction skills, independent-living skills, career education, sensory-efficiency skills and self-determination.  In addition the IEP did not give

---

[1] Plaintiffs also state, "[n]owhere in the IEP does it set forth 'an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class' as required under 34 C.F.R. § 300.320(a)(5)."  (Pl. Reply Br., p. 10.)  The IEP, however, did provide that I.N. would spend some time in the Therapy Room for Occupational & Physical Therapy while the non-disabled students were in Art or Physical Education.

a general structure for orientation and mobility.  As to these skills, however, the testimony of the Board's experts satisfactorily revealed how these skills would be taught.  Social-interaction skills would be taught using Braille board games, interaction on a daily basis with sighted peers, and the teaching to sighted peers of how I.N. would learn.  I.N. would be provided with a partner with whom she could listen and share information.  The partners would discuss respect, personal distance, and other items necessary for interaction with others.  Independent-living skills would consist of teaching I.N. how to feed and care for herself without knocking food off of her plate, and demonstrating to I.N. how to use the bathroom, open doors, and get to her bus.  Career education would be addressed with a classroom job chart which would rotate each week.  I.N. would have been able to undertake all of the jobs.  Sensory-efficiency skills would be taught by teaching I.N. about what items feel like through sensory activities such as rubbing hand lotion, and by having I.N. use her senses in the environment.  The teaching strategies of a Braille-enriched environment and consultation and integrated therapy goals throughout the classroom would assist I.N. with self-determination.  In addition, the Statement section of the IEP would provide I.N. with occupational and physical therapy.  The Board was prepared to implement a team of professionals which would cover any gaps in the ECC, and ensure that all nine of the ECC requirements were met.

The Court finds that the ALJ's decision that the cited deficiencies in the June 2010 IEP did not arise to a denial of FAPE was supported by the evidence presented at the hearing.

Next, Plaintiffs contend that the Defendant used Brophy's draft for the IEP, despite that she may not have intended it to be used at a public school, but at a school for the blind.  The 2010-11 IEP, however, clearly designates the in-District Birches Elementary School as the placement proposed for the 2010-11 school year.

As to the argument that the 2010-11 IEP was written solely for the extended school year ("ESY"), or summer, the ALJ determined that the 2010-2011 IEP contained specific provisions that could only be implemented during a full academic school year at Birches, including 1) progress reporting to Plaintiffs quarterly; 2) I.N.'s Schedule for General/Special Education Classes and Related Services to begin in September, 2010 and end in June, 2011; 3) a teaching strategy for adaptations made to "specials," such as

music, gym, art and library; and 4) a teaching strategy for all seven goals to provide I.N. access to print materials at the same time as her peers.  See Decision, p. 40. Additionally, Brophy, Plaintiffs and Plaintiffs' counsel were told at the beginning of the first IEP Team meeting that the purpose of the meeting was to conduct an annual review and develop an IEP addressing not only ESY, but also the entire 2010-2011 school year. See Decision, p. 40.  Further, none of I.N.'s previous IEPs, each of which were authored by Brophy and provided for an ESY program, contained a separate IEP for the ESY portion of the school year.   See Decision, p. 40.  The Court finds this argument without merit.

Plaintiffs also argue that "S.N. and Ms. Brophy were excluded from the evolution of the [Defendant's] plan to educate I.N." (Pl. Br., p. 21.)  They contend that Brophy was the only person on the child study team "with knowledge of I.N." (Id.)  Plaintiffs argue, however, that Defendant violated 20 U.S.C. § 1414(d)(4)(A)(ii), which requires that "the IEP Team" "revises the IEP as appropriate," because Defendant allegedly "revised" the IEP "unilaterally," without the inclusion of Ms. Brophy.  (Pl. Br., p. 23.)  Obviously, Brophy provided significant input in the development of the 2010-11 IEP.  Further, the ALJ found "Plaintiffs' argument that they were not involved in the plan of education or the implementation of the IEP is without merit," Decision, p. 54, and cited the example of S.N.'s demand for a TVI for I.N.  Decision, p. 35.  In short, the ALJ found that the resulting 2010-2011 IEP was the result of a collaborative effort by all IEP Team members, who reviewed and discussed I.N.'s Present Levels of Educational Performance.  See Decision, p. 35.  This Court agrees that Plaintiffs were not denied meaningful participation in the IEP process.

Next, Plaintiffs argue that Defendant violated the IDEA, 20 U.S.C. § 1415(b)(3)(B), when it did not communicate proposed "changes" to I.N.'s IEP [aspects of the IEP originally omitted, which the ALJ determined were adequately covered through testimony] in writing prior to the due process hearing.  (Pl. Br., p. 23-24.)[2]  Defendants state that Board's testimony regarding implementation of the IEP did not constitute a "change" to the 2010-11 IEP.  (Def. Br., p. 2.)

The ALJ concluded that all actions taken by Giordano, Rolen, Miller, and the Commission were directed at implementing specific components set forth in the 2010-11 IEP in preparation for I.N.'s 2010-11 school year at Birches and, as such, "were not subject to prior consent."  Decision, p. 54.

> The Board's actions subsequent to the June 10, 2010 IEP were taken to implement the goals and objectives of the IEP, and the ECC in the IEP.  All of the Board's actions in implementing the IEP were not subject to the parents' prior consent, and the Board properly entered into contracts, and hired the staff necessary to implement the IEP.  This did not deny the parents meaningful participation in the IEP process.

Id.  This Court agrees that there were no "changes" to the IEP that required written notice to or approval by Brophy or Plaintiffs.  Rather, the testimony elicited at trial supported the IEP by describing how it was to be implemented, but did not change the IEP.

---

[2]Similarly, by considering testimony at the due process hearing to fill in the blanks of the IEP to determine that Defendants were to provide a FAPE, Plaintiffs contend that the ALJ erred because he failed to adjudge the propriety of the IEP at the time it was made.  (Pl. Br., p. 25.)

The Court finds that the ALJ's Decision was well-founded and supported by the testimony in the record.  The substantive content of the 2010-11 IEP was designed to confer FAPE to I.N. in the least restrictive environment, "to the greatest extent possible, satisfactorily educat[ing I.N.] together with children who are not disabled, in the same school [she] would attend if [she] were not disabled."  Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995).  As developed, the IEP would have provided I.N. with meaningful educational benefit, and Plaintiffs were not deprived of same through any procedural irregularities.  Accordingly, the ALJ properly denied Plaintiffs' request for reimbursement of tuition and transportation costs for their unilateral placement of I.N. at St. Lucy's.

## CONCLUSION

For these reasons as well as those expressed on the record on May 15, 2012,

IT IS ORDERED on this 27th day of September, 2012 that Defendant's motion for summary judgment [10] is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' motion for summary judgment [11] is hereby DENIED.

 /s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.

15